UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **CASEEXPERTS, LLC** | **CIVIL ACTION NO. 09-1903** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **COMPSTAR SYSTEMS, INC., ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

**RULING**

Pending before the Court are Plaintiff CaseExperts, LLC's ("CaseExperts") Motion for Summary Judgment [Doc. No. 53] and Motion for Partial Summary Judgment [Doc. No. 54], Third Party Defendant CBS Technology, LLC's ("CBS") Motion for Summary Judgment [Doc. No. 55], and Defendants CompStar Systems, Inc. ("CSS") and Brian Henke's ("Henke") Motion for Summary Judgment [Doc. No. 56].

For the following reasons, CaseExperts' Motion for Summary Judgment [Doc. No. 53] is GRANTED IN PART and DENIED IN PART, CaseExperts' Motion for Partial Summary Judgment [Doc. No. 54] is DENIED, CBS' Motion for Summary Judgment [Doc. No. 55] is GRANTED, and CSS and Henke's Motion for Summary Judgment [Doc. No. 56] is DENIED.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

This case arises out of an oral agreement involving a nurse case management software program called CaseDirector.

In October 2005, Bruce Davis ("Davis"), part owner of CaseExperts,[1] emailed Henke, owner of CSS, seeking a license to use CSS' medical review software program called CompStar.

---

[1] CaseExperts was originally named Ark-La-Miss Case Management, LLC, but, some time in 2006, changed its name to CaseExperts, LLC.

CaseExperts and CSS entered into a software licensing agreement applicable to CompStar. Davis also asked Henke about the availability of a nurse case management software program. Henke stated that he did not have such a program, but was interested in developing one.

In November 2005, Henke flew to Monroe, Louisiana, to meet with Davis and Scott Parker ("Parker"), also a part owner of CaseExperts, and to review Virtual Case File, the nurse case management software program CaseExperts was using at the time.

The parties then entered into an oral agreement. The terms of that agreement are disputed. CSS alleges that it agreed to write, design, and develop CaseDirector, and CaseExperts agreed to assist in the development of, market, and use CaseDirector. CaseExperts alleges that it agreed to "provide the experience, expertise and knowledge necessary to develop a marketable program," and CSS agreed to "provide all computer expertise and maintenance." [Doc. No. 54-1, p. 2]. The parties also dispute how revenues were split under the agreement. CaseExperts alleges that it is entitled to 25% of CaseDirector sales. CSS alleges that CaseExperts is entitled to 25% of sales CaseExperts generated by marketing CaseDirector.

It is undisputed that CaseExperts paid CSS a discounted fee to use CaseDirector in its own business, and CaseExperts was able to access CaseDirector over the internet with the use of a password. CSS sent CaseExperts a software licensing agreement applicable to CaseDirector, but no CaseExperts' representative signed the agreement. *See* [Doc. No. 61, Exhibit 3]. The CaseDirector software licensing agreement contained a confidentiality provision, which stated, in pertinent part:

> Licensee hereby acknowledges that [CaseDirector] (including any Documentation, source code, translations, compilations, partial copies and derivative works) contains confidential and proprietary information belonging exclusively to Licensor . . . .
>
> [T]he Licensee hereby agrees . . . it shall not use, commercialize or disclose such

>Confidential & Properietary Information to any person or entity, except to its own employees who have a 'need to know' (and who themselves are bound by similar nondisclosure restrictions), and to such other recipients as the Licensor may approve in writing; provided that all such recipients shall have first executed a confidentiality agreement in a form acceptable to Licensor.

On November 29, 2006, Henke emailed Davis and Parker and requested that CaseExperts pay CSS an increased fee to use CaseDirector. Specifically, the email stated, in pertinent part:

>Our original verbal agreement for use of the CaseDirector was a per seat price of $20 per month and a 25% revenue share for you on sales you made.
>
>. . .
>
>When I agreed to these rates, I felt it was the right decision based on the anticipated number of CaseDirector sales and monthly bill review volume.
>
>After reviewing the sales from 2006 on CaseDirector (none) as well as the total volume of bills reviewed (433), I need to make pricing adjustments to justify my continued support for you on these products.
>
>. . .
>
>CaseDirector (Monthly)
>
>- $100 / seat. Based on your most recent activity, this would be a total of 10 seats which include: Bruce, Terrisa, Karen, Ryan, Tommye Jane, Donna, Jennifer, Kristy, Beki and Matt (e.g. Scott). Additional seats would be priced at the rate listed.
>
>The pricing changes that I'm quoting you above would go into effect starting January 1, 2007.
>
>Please note that it is not my intention to lose you as a customer by making these changes, however, I cannot stay financially viable at the current agreed upon rates.

[Doc. No. 56-7].

On November 30, 2006, Henke, Davis, and Parker held a conference call and spoke about

3

the increased fee. The call was secretly recorded by Davis and Parker.[2]

Sometime thereafter, CaseExperts hired Brian Roberts ("Roberts") to design and program a new nurse case management software program called CaseExperts Online. Roberts eventually quit, and CaseExperts hired Jason Yelverton ("Yelverton") to finish the program. Yelverton used the source code and javascript prepared by Roberts to create CaseExperts Online. Roberts averred and Yelverton testified that they saw CaseDirector being used on CaseExperts' computers, but never viewed CaseDirector's source code or javascript. Later, CaseExperts hired Yelverton to design a medicare set-aside program called EZ-MSA.

As soon as CaseExperts Online became functional, CaseExperts terminated its use of CaseDirector. On February 23, 2008, Davis sent Henke a letter stating that CaseExperts would no longer use CaseDirector. [Doc. No. 62, Exhibit 8].

On September 28, 2009, CaseExperts filed suit in state court against CSS and Henke and alleged that it was entitled to 25% of CaseDirector sales and that CaseExperts and CSS entered into a joint venture involving CaseDirector. CaseExperts also alleged claims for negligence, unjust enrichment, detrimental reliance, fraud, intentional tort, and intentional interference with business relationships.

On November 9, 2009, CSS[3] removed the case to this Court.

On April 26, 2010, CSS filed counterclaims against CaseExperts and a third party complaint

---

[2]A transcript of the call was submitted to the Court. *See* [Doc. Nos. 56-8 & 60-7].

[3]Unless otherwise noted, the Court will refer to CSS and Henke collectively as "CSS."

against CBS, CaseExperts' sister company, alleging that CaseExperts[4] misappropriated its trade secret in CaseDirector's "functionality and . . . look" by creating, using, and selling CaseExperts Online and EZ-MSA and that CaseExperts engaged in unfair trade practices by copying and mimicking CaseDirector when it created CaseExperts Online and EZ-MSA. CSS also alleged claims for breach of a licensing agreement, fraud, conversion, intentional tort, and unjust enrichment. CSS' claims against CBS are based solely on its alleged involvement in the creation, use, and sale of EZ-MSA. *See* [Doc. No. 63, p. 1].

On August 25, 2010, CaseExperts filed a Motion for Summary Judgment [Doc. No. 53] on CSS' counterclaims and a Motion for Partial Summary Judgment [Doc. No. 54] on the issue of whether CaseExperts and CSS entered into a joint venture; CSS filed a Motion for Summary Judgment [Doc. No. 56] on CaseExperts' claims; and CBS filed a Motion for Summary Judgment [Doc. No. 55] on CSS' third party claims.

A bench trial in this matter is set for December 7, 2010.

## II.     LAW AND ANALYSIS

### A.     Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*,

---

[4] Unless otherwise noted, the Court will refer to CaseExperts and CBS collectively as "CaseExperts."

954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

"If [a] decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978). "Thus, where . . . the evidentiary facts are not disputed, a court in a non-jury case may grant summary judgment if trial would not enhance its ability to draw inferences and conclusions." *Id*. at 1124.

  **B.**  **CSS' Claims**

    *1.*  *Misappropriation of Trade Secrets*

CaseExperts asserts there is no evidence that CaseDirector is a trade secret, that CaseExperts misappropriated CaseDirector, or that CSS suffered an actual loss caused by the alleged

6

misappropriation. [Doc. Nos. 53 & 55].

Trade secrets in Louisiana are governed by the Louisiana Uniform Trade Secrets Act ("LUTSA"), LA. REV. STAT. § 51:1431, *et seq*. To establish a claim under LUTSA, CSS must prove "(1) the existence of a trade secret, (2) a misappropriation of the trade secret, and (3) actual loss caused by the misappropriation." *Tubos de Acero de Mexico, S.A. v. Amer. Intern. Inv. Corp., Inc.*, 292 F.3d 471, 483 (5th Cir. 2002) (citation omitted). A trade secret is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
>
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

LA. REV. STAT. § 51:1431(4). "The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets." *Tubos*, 292 F.3d at 483 (internal quotation marks and citation omitted). "[E]ven in the absence of a restrictive covenant not to disclose confidential information, trade secrets will be protected where a confidential relationship exists." *Engineered Mech. Servs., Inc. v. Langlois*, 464 So.2d 329, 334 (La. Ct. App. 1 Cir. 1984) (citation omitted). However, "[a] disclosure of a trade secret to others who have no obligation of confidentiality extinguishes the property right in the trade secret." *Tubos*, 292 F.3d at 483 (internal quotation marks and citation omitted).

First, CSS contends that CaseDirector's functionality and look have significant independent economic value, and, thus, constitute a trade secret. [Doc. No. 61-2, Exhibit 1] (affidavit of Henke).

CaseExperts offers evidence in the form of screenshots in support of its argument that

CaseDirector's functionality and look are not unique to CaseDirector, but are similar to preexisting case management software programs. *See* [Doc. Nos. 82-1 & 83-3]. However, without further testimony and higher quality screenshots, the Court is unable to adequately analyze each program's appearance and determine which functions were unique to CaseDirector and what those functions do. Therefore, the Court finds there remains a genuine issue of material fact whether CaseDirector derives independent economic value from its functionality and look.

CSS also offers evidence of its efforts to maintain CaseDirector's secrecy. It is undisputed that CaseDirector is accessible only to its customers with the use of a password and that CSS sent CaseExperts a software licensing agreement applicable to CaseDirector that contained a confidentiality provision. CSS admits that no one signed the agreement, but argues that the confidentiality provision put CaseExperts on notice that CSS intended that CaseDirector be kept confidential. Although CSS had the ability to deny CaseExperts access to CaseDirector because CaseExperts had not executed the agreement, CSS did not do so. If this were the only evidence before the Court, the Court would be compelled to find that CSS did not use reasonable efforts to protect CaseDirector's secrecy.

However, CaseExperts asserts in its Motion for Partial Summary Judgment [Doc. No. 54] that it entered into a joint venture with CSS. "The relationship between joint venturers, like that existing between partners, is fiduciary" and confidential in character. *Joyner v. Liprie*, 44-852-CA (La. App. 2 Cir. 1/29/10), 33 So.3d 242, 252 (citation omitted). If CaseExperts and CSS entered into a joint venture, then they had a confidential relationship, and CSS' efforts to maintain CaseDirector's secrecy were reasonable. As discussed later in this Ruling, there is a genuine issue of material fact for trial whether the parties entered into a joint venture. *See Defcon, Inc. v. Webb*, 28898-CA (La.

8

App. 2 Cir. 1/22/97), 687 So.2d 639, 642. Until the Court can determine whether the parties entered into a joint venture, there remains a genuine issue of material fact whether CSS used reasonable efforts to protect CaseDirector's secrecy.

Second, CSS contends that CaseExperts misappropriated CaseDirector and submits evidence that CaseExperts copied and mimicked CaseDirector's functionality and look when it created CaseExperts Online. Yelverton testified that he took notes while someone at CaseExperts gave CaseDirector demonstrations to him, that CaseExperts employees told him what functions of CaseDirector should be included in CaseExperts Online, and that he matched CaseExperts Online icons with CaseDirector icons. [Doc. No. 61, Exhibit 11]. Furthermore, emails to and from Roberts, Yelverton, and Parker refer to CaseDirector in various discussions of CaseExperts Online and/or EZ-MSA.[5]

Based on this evidence, the Court finds there remains a genuine issue of material fact whether CaseExperts misappropriated CaseDirector.[6]

Third, CSS contends that it suffered an actual loss caused by the creation, use, and sale of CaseExperts Online by offering evidence that CaseExperts is currently marketing CaseExperts Online through emails. *See* [Doc. No. 61, Exhibit 41]. Although the marketing of a competing

---

[5]CSS also submits screenshots of CaseDirector, CaseExperts Online, and EZ-MSA to show the similarity of the capabilities and layouts between the three programs. [Doc. No. 82-1]. Likewise, CaseExperts submits screenshots of CaseDirector and Virtual Case File to show that those capabilities and layouts existed in Virtual Case File, a program created prior to CaseDirector. [Doc. No. 83-3]. As noted earlier in this Ruling, the Court is unable to adequately analyze the appearance and content of the screenshots at this stage in the proceeding.

[6]CaseExperts asserts that there is no evidence that it misappropriated any of CaseDirector's source code or javascript. [Doc. No. 53-1, pp. 8-10]. However, CSS alleges claims for misappropriation of trade secrets based on CaseDirector's functionality and looks, not its source code or javascript.

software is not proof of an actual loss, it is undisputed that, in early 2008, CaseExperts replaced its use of CaseDirector with CaseExperts Online and stopped paying CSS a fee to use CaseDirector. Therefore, the Court finds that CSS has met its burden of showing an actual loss caused by the creation and use of CaseExperts Online.

Given the Court's findings, CSS' claim against CaseExperts for misappropriation of CaseDirector's functionality and look by the creation, use, and sale of CaseExperts Online remains pending for trial. CaseExperts' Motion for Summary Judgment [Doc. No. 53] on this claim is DENIED.

However, CSS does not offer evidence that it suffered an actual loss caused by the creation, use, and sale of EZ-MSA. It is undisputed that CSS does not sell a medicare set-aside program, and, therefore, CSS does not use or sell a program that competes with EZ-MSA. Therefore, CaseExperts' and CBS' Motions for Summary Judgment [Doc. Nos. 53 & 55] on CSS' claims for misappropriation of trade secrets caused by the creation, use, and sale of EZ-MSA are GRANTED, and these claims are DISMISSED WITH PREJUDICE.

### 2. *Unfair Trade Practices*

CaseExperts asserts there is no evidence that it engaged in unfair trade practices. [Doc. Nos. 53 & 55].

CSS' claims for unfair trade practices arise under the Louisiana Unfair Trade Practices Act ("LUTPA"), LA. REV. STAT. § 51:1401, et seq. LUTPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." § 51:1405(A). "An act is not required to be both unfair and deceptive."[7] *United Grp.*

---

[7]CSS does not contend that CaseExperts engaged in deceptive trade practices.

of *Nat'l Paper Distribs., Inc. v. Vinson*, 27-739 (La. App. 2 Cir. 1/25/96), 666 So.2d 1338, 1345. "This legislation is broadly and subjectively stated and does not specify particular violations. Rather, what constitutes an unfair trade practice is determined by the courts on a case-by-case basis." *Levine v. First Nat'l Bank of Commerce*, 948 So.2d 1051, 1065 (La. 2006) (citation omitted). "[A] practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious." *Roustabouts, Inc. v. Hamer*, 447 So.2d 543, 548 (La. Ct. App. 1 Cir. 1984) (citation omitted). "A defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition." *Vinson*, 666 So.2d at 1345 (citing *Monroe Med. Clinic, Inc. v. Hosp. Corp. of Amer.*, 622 So.2d 760 (La. App. 2 Cir. 1993)).

The Court finds, as a matter of law, that CaseExperts did not engage in unfair trade practices. The undisputed evidence shows that CaseExperts hired Roberts to design and program CaseExperts Online after Henke notified Davis and Parker that CSS was increasing its fee to use CaseDirector by 500%. It appears, therefore, that CaseExperts created CaseExperts Online, not to sell as a competitor of CSS, but to use in its own business and in response to CSS' fee increase. The Court cannot find that a customer's decision to hire an expert to develop a software program in response to a large fee increase is "unethical, oppressive, unscrupulous, or substantially injurious."

The Court has not disregarded CSS' evidence that CaseExperts began marketing CaseExperts Online for sale via email in March, 2009. [Doc. No. 61, Exhibit 41]. However, those emails occurred over a year after CaseExperts terminated its agreement with CSS and began using CaseExperts Online. Finally, the Court is not persuaded by the argument that using a program internally for one's own benefit constitutes action taken with the specific purpose to harm the competition. *See Vinson*, 666 So.2d at 1346 ("The evidence in this case shows that [the defendants]

11

affiliated with CDI not to harm [the plaintiff], but rather to protect the interests of their own companies and the companies they represented.")

CSS cites *Huey T. Littleton Claims Serv., Inc. v. McGuffee*, 497 So.2d 790 (La. Ct. App. 3 Cir. 1986), in support of its arguments, but, in that case, an employee of an insurance claims adjusting firm violated LUTPA when he copied his employer's confidential client lists and solicited his employer's customers prior to resigning. *Id*. at 794. In this case, even assuming a confidential relationship existed between CaseExperts and CSS, there is no evidence that CaseExperts used CSS' customer lists, solicited any of CSS' customers to purchase CaseExperts Online, or engaged in any other actions constituting violations of LUPTA..

CaseExperts' and CBS' Motions for Summary Judgment [Doc. Nos. 53 & 55] on CSS' claims for violations of LUPTA are GRANTED, and those claims are DISMISSED WITH PREJUDICE.

### 3. *Breach of a Licensing Agreement, Fraud, Conversion, Intentional Tort, and Unjust Enrichment*

CaseExperts asserts there is no evidence to support CSS' claims for breach of a licensing agreement, fraud, conversion, intentional tort, and unjust enrichment. [Doc. No. 53].

CaseExperts filed its Motion for Summary Judgment under the assumption that CSS was pursuing counterclaims for misappropriation of trade secrets, unfair trade practices, breach of a licensing agreement, fraud, conversion, intentional tort, and unjust enrichment. However, CSS only opposes summary judgment on its claims for misappropriation of trade secrets and unfair trade practices. *See* [Doc. No. 61, pp. 15 & 18] (arguing only that "Plaintiff . . . misappropriated [CSS'] trade secrets" and "violat[ed] Louisiana's Unfair Trade Practices Act."); [Doc. No. 63].

"The Fifth Circuit consistently holds that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal. *Lookingbill v. Cockrell*, 293 F.3d 256, 264 (5th Cir. 2002) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 747 n.16 (5th Cir. 2000); *Johnson v. Puckett*, 176 F.3d 809, 814 (5th Cir. 1999)). By analogy, failure to brief an argument in the district court waives that argument in that court." *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F.Supp.2d 653, 658 n.9 (S.D. Tex. 2008).

The Court finds, to the extent that CSS alleged claims for breach of a licensing agreement, fraud, conversion, intentional tort, and unjust enrichment, those claims have been waived. Furthermore, by filing responses to CaseExperts' Motions for Summary Judgment without addressing those claims, CSS has, in essence, admitted that those claims should be dismissed.

CaseExperts' and CBS' Motions for Summary Judgment [Doc. Nos. 53 & 55] on CSS' claims for breach of a licensing agreement, fraud, conversion, intentional tort, and unjust enrichment are GRANTED, and these claims are DISMISSED WITH PREJUDICE.

In summary, CaseExperts' Motion for Summary Judgment [Doc. No. 53] is GRANTED IN PART and DENIED IN PART. CaseExperts' Motion for Summary Judgment on CSS' claims for misappropriation of trade secrets caused by the creation, use, and sale of EZ-MSA, unfair trade practices, breach of a licensing agreement, fraud, conversion, intentional tort, and unjust enrichment are GRANTED, and those claims are DISMISSED WITH PREJUDICE. CaseExperts' Motion for Summary Judgment on CSS' claims for misappropriation of trade secrets caused by the creation, use, and sale of CaseExpertsOnline is DENIED. CBS' Motion for Summary Judgment [Doc. No. 55] is GRANTED, and CSS' claims against it are DISMISSED WITH PREJUDICE.

    **C.    CaseExperts' Claims**

    ***1.    Breach of Contract***

CSS asserts there is no evidence that CaseExperts is entitled to 25% of CaseDirector sales, that CaseExperts is only entitled to 25% of sales CaseExperts generated from marketing CaseDirector, and that, because it did not generate any sales, CaseExperts is not entitled to any damages. [Doc. No. 56].

"A party claiming the existence of a contract has the burden of proving that the contract was perfected between himself and his opponent." *Pennington Constr., Inc. v. R A Eagle Corp.*, 94-CA-0575 (La. App. 1 Cir. 3/3/95), 652 So.2d 637, 639 (citation omitted). "If the price or value of an oral contract is in excess of $500, the contract must be proved by at least one witness and other corroborating circumstances."[8] *Joyner v. Liprie*, 44-852-CA (La. App. 2 Cir. 1/29/10), 33 So.3d 242, 250 (citing LA. CIV. CODE art. 1846). "To meet the burden of proof of an oral contract by a witness and other corroborating circumstances, a party may serve as his own witness and the 'other corroborating circumstances' may be general and need not prove every detail of the plaintiff's case." *Pennington*, 652 So.2d at 639 (citation omitted). "However, the corroborating circumstances that are required must come from a source other than the plaintiff." *Id*. "Whether there were corroborating circumstances sufficient to establish an oral contract is a question of fact." *Id*.

Davis and Parker testified that CaseExperts and CSS entered into an oral agreement where CaseExperts was entitled to 25% of CaseDirector sales. [Doc. No. 60-5, pp. 17 & 18], [Doc. No. 60-6, p. 11]. During the November 30, 2006 conference call, a transcript of which has been provided

---

[8]The parties do not seem to dispute that the price or value of the alleged oral contract is in excess of $500.00.

to the court, Henke stated, "[y]ou guys are getting twenty-five percent perpetually on any sales, right," and "[i]t was never my intention to say, you know what, look, if you guys, you know the twenty-five percent revenue, I'm not trying to screw anybody and say oh, well we never talked about twenty-five percent, we absolutely talked about twenty-five percent, right?" [Doc. No. 60-7, pp. 23-24]. It is undisputed that CaseExperts invested time and money in the development of CaseDirector. A company is less likely to invest time and money in the development of a product with another company if it was only entitled to a 25% commission based on its own sales.

However, During the November 30, 2006 conference call, Davis and Parker did not correct Henke when he stated, ". . . you guys were going to get a revenue share from what you sold. Right?"; "you guys will get a twenty-five percent revenue share out of everything you sell plus this reduced rate, right?" and "[i]f [a CaseExperts employee] called up 100, you know, 900 of those case managers and said f*** sign me up, you guys get twenty-five percent of that." [Doc. No. 56-8, pp. 1-3]. However, CaseExperts offers similar evidence to create a genuine issue of material fact. During the same conference call, Henke did not correct Davis when he stated, ". . . the way it was, which was you're getting seventy-five percent, we're getting twenty-five, you know because that was our original was you owned an additional twenty-five because your costs which would be higher once we sell it." [Doc. No. 60-8, p. 5].

Considering the evidence submitted, the Court finds there remain genuine issues of material fact whether CaseExperts is entitled to 25% of CaseDirector sales or 25% of sales CaseExperts generated from marketing CaseDirector.

Assuming CaseExperts is only entitled to 25% of sales it generated from marketing CaseDirector, the Court finds there remains a genuine issue of material fact whether CaseExperts

generated any sales from marketing CaseDirector.

CaseExperts submits evidence that CSS completed a sale in 2008 to Advanced Medical Consulting, a company in Louisiana, because of CaseExperts' marketing efforts. Henke testified that CaseExperts provided him a sales lead and that one of those leads yielded him a customer. [Doc. No. 60-2, pp. 68 & 69].

CSS offers evidence that CaseExperts did not generate any sales from marketing CaseDirector. Donna Norman, a CaseExperts employee, testified that, in essence, CaseExperts only marketed the fact that CaseExperts used CaseDirector, so that clients would hire CaseExperts as their nurse case management company. [Doc. No. 56-11, p. 24]. Parker testified that CaseExperts only marketed CaseDirector for "[a]bout a year" and that CaseExperts "tapered off" its marketing efforts after November 2006. [Doc. No. 56-5, pp. 39, 57, & 58]. However, this evidence is probative of the amount of sales CaseExperts generated, not whether there were any sales at all.

There remain genuine issues of material fact whether CaseExperts is entitled to 25% of CaseDirector sales or 25% of sales CaseExperts generated from marketing CaseDirector and whether CaseExperts generated any sales from marketing CaseDirector.

### 2. *Claims Based in Tort*

CSS asserts that CaseExperts' claims based in tort have prescribed because CaseExperts knew or should have known, in November 2006, that CSS was not going to pay it 25% of CaseDirector sales, other than those generated by CaseExperts' marketing efforts. [Doc. No. 56].

"A party generally must assert a delictual claim within one year from the date the injury or damage is sustained." *Hoerner v. Wesley-Jensen*, No. 95-0553 (La. App. 4 Cir. 11/20/96); 684 So.2d 508, 510 (citing LA. CIV. CODE art. 3492). "If the face of the petition shows the prescriptive period

has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred." *Id*. (citation omitted). "However, such a limitation must be strictly construed against prescription and in favor of maintaining the obligation sought to be extinguished." *Id*. One way to suspend prescription is through "the judicially created doctrine of *contra non valentem* . . . ." *Id*. "Under this doctrine, prescription is suspended until the plaintiff knows or should know of the damage, the wrongful act and the connection between them." *Id*. (citation omitted). CaseExperts filed suit on September 28, 2009. Thus, if this doctrine applies, prescription must have been suspended until September 28, 2008, for CaseExperts filing to have been timely.

CaseExperts offers evidence that it did not know and should not have known, until 2009, that CSS was not going to pay it 25% of CaseDirector sales. Parker testified that, in November 2006, he was not concerned that Henke may have been selling CaseDirector and not sharing the revenue. [Doc. No. 60-5, pp. 34 & 35]. During the November 30, 2006 conference call, Davis stated, "I'm still amazed that we haven't sold a single seat yet," and Henke replied that the parties' time investment in CaseDirector ". . . as of 11/30/06 . . . didn't result in anything" and that there was ". . . a year of no activity and no sales . . . ." [Doc. No.60-7, pp. 11 & 22]. Finally, Parker testified that CaseExperts did not know that CSS was generating sales of CaseDirector until August or September 2009 when a competitor of CaseExperts informed him that it was paying for and using CaseDirector. [Doc. No. 60-5, pp. 31 & 32].

CSS offers evidence that CaseExperts knew or should have known in November 2006 that CSS was not going to pay it 25% of CaseDirector sales. Davis and Parker began secretly recording their conversations with Henke on November 30, 2006. Parker testified that CaseExperts printed

and copied documents related to CaseDirector in November 2006, because "at that point we knew we had a problem on our hands . . . ." [Doc. No. 56-5, p. 34]. However, it appears that the recording was in response to CSS' fee increase. Likewise, the problem Parker was referring to was CSS' fee increase, not that CSS was going to refuse to pay it 25% of CaseDirector sales.

Accordingly, the Court finds that CaseExperts has raised a genuine issue of material fact whether it knew or should have known before September 28, 2008, that CSS was generating sales of CaseDirector.

CSS and Henke's Motion for Summary Judgment [Doc. No. 56] is DENIED.

### D. Joint Venture

CaseExperts moves the Court for a partial summary judgment declaring that it and CSS entered into a joint venture. [Doc. No. 54].

"[J]oint []ventures arise only where the parties intended the relationship to exist. They are ultimately predicated upon contract either express or implied." *Pillsbury Mills, Inc. v. Chehardy*, 90 So.2d 797, 801 (La. 1956) (citation omitted). A joint venture is "a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership." *Florida Universal Fin. Corp. v. Cox*, 493 So.2d 710, 713 (La. Ct. App. 2 Cir. 1986) (citation omitted).

> In order to form a valid joint venture in Louisiana, the following elements are required:
>
> (A) All parties must consent to formation of a partnership;
>
> (B) There must be a sharing of losses of the venture as well as the profits; and
>
> (C) Each party must have some proprietary interest in, and be allowed to exercise some right of control over, the business.

*Arcement Boat Rentals, Inc. v. Good*, 2001-CA-1860 (La. App. 4 Cir. 5/29/02); 820 So.2d 615, 618. (citing *Marine Servs., Inc. v. A-1 Indus., Inc.*, 355 So.2d 625, 628 (La. Ct. App. 4 Cir. 1978)). A joint venture requires that "each party . . . have equal right to direct and govern the conduct of the other involved, as well as some voice in the control and management of the business undertaking which is the subject of the parties relationship." *Westenberg v. Louisiana*, 333 So.2d 264, 271 (La. Ct. App. 1 Cir. 1976) (citing *Hauth v. Iacoponelli*, 204 So.2d 767 (La. 1967)). "The existence or nonexistence of a joint venture is a question of fact, although what constitutes a joint []venture is a question of law." *Grand Isle Campsites, Inc. v. Cheek*, 262 So.2d 350, 357 (La. 1972) (citation omitted).

The only evidence CaseExperts offers in support of its assertion that it and CSS entered into a joint venture is Henke's deposition testimony:

> CaseExperts' Counsel: Obviously, I'm disputing what the agreement was. But as you sit here today, your memory, is that prior to your Louisiana trip, the first one in '05, a discussion had been had about 75/25 split of profits made on sales made by CaseExperts?
>
> Henke: Yes.

[Doc. No. 54-3, pp. 26-27]. However, Henke testified only that CaseExperts and CSS entered into a profit sharing agreement. "[A] mere agreement to share the profits from an enterprise is not sufficient to create the status of a . . . joint venture." *Terry v. Slidell Refrigerating & Heating, Inc.*, 271 So.2d 536, 540 (La. Ct. App. 1 Cir. 1973) (citing *Pennington v. Simmons*, 138 So.2d 189 (La. Ct. App. 1 Cir. 1962)). CaseExperts must offer summary judgment type evidence establishing the elements of a joint venture. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). It has not done so.

Therefore, CaseExperts' Motion for Partial Summary Judgment [Doc. No. 54] is DENIED.

## III. CONCLUSION

For the foregoing reasons, CaseExperts' Motion for Summary Judgment [Doc. No. 53] is GRANTED IN PART and DENIED IN PART. The Motion for Summary Judgment is GRANTED to the extent that CSS' and Henke's asserted claims against CaseExperts for misappropriation of trade secrets caused by the creation, use, and sale of EZ-MSA, unfair trade practices, breach of a licensing agreement, fraud, conversion, intentional tort, and unjust enrichment. These claims are DISMISSED WITH PREJUDICE. CaseExperts' Motion for Summary Judgment is DENIED to the extent that CSS and Henke asserted claims against CaseExperts for misappropriation of trade secrets caused by the creation and use of CaseExperts Online.

CaseExperts' Motion for Partial Summary Judgment [Doc. No. 54] is DENIED.

CBS' Motion for Summary Judgment [Doc. No. 55] is GRANTED, and CSS' and Henke's claims against CBS are DISMISSED WITH PREJUDICE.

CSS and Henke's Motion for Summary Judgment [Doc. No. 56] is DENIED. CaseExperts claims' against CSS and Henke remain pending in this case.

MONROE, LOUISIANA, this 3rd day of November, 2010.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE